Complaint

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF KENT

JADE PIG VENTURES – RIVER RIDGE, LLC,

        Plaintiff,

vs.

CITY OF WALKER,

        Defendant.

Case No. 24- 0 2 4 0 1   - CH

Hon.

SCOTT A. NOTO
(P-37833)

2024 MAR -8  PH 3: 55

RECEIVED FILED
KENT COUNTY
CIRCUIT COURT

---

Michael P. Hindelang (P62900)
Brandon J. Wilson (P73042)
Laura E. Biery (P82887)
Honigman LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
(313) 465-7000
Attorneys for Plaintiff

---

There is no other pending or resolved civil action
arising out of the transaction or occurrence
alleged in the Complaint.

Brandon J. Wilson (P73042)

## COMPLAINT

    Plaintiff Jade Pig Ventures – River Ridge, LLC ("JPV"), by and through its attorneys,

Honigman LLP, brings this action against the City of Walker ("Defendant" or the "City") and in

support thereof, alleges as follows:

### PRELIMINARY STATEMENT

    1.    JPV owns parcels of land in the City of Walker that it has proposed to develop into

a residential community—a development the City admits is one of "right" and which conforms in

every way with the City's own ordinance.  But because of irrational biases among certain City staff and Planning Commission members, fueled by a desire to please a pack of neighbors opposing any development of JPV's property, the proposed development was apparently dead on arrival.

2.      Since JPV submitted its preliminary area site plan to the City more than two years ago, JPV has followed every ordinance and every lawful requirement of the City.  Despite JPV meeting every requirement for having its preliminary site plan approved, and despite the acknowledgement by City representatives that JPV's proposed site plan meets all requirements and is simply the "first stop" in the process, the City refused to follow its own ordinances and refused to even approve the proposed *preliminary* site plan.

3.      Contrary to the express intent of the applicable zoning district "to encourage more imaginative and livable housing environments within that district," the City has engaged in a scheme to unlawfully obstruct JPV's lawful development of its property in violation of Michigan law, the City's own ordinance, and JPV's constitutional rights.  The City's improper actions have caused significant financial damages to JPV, violated JPV's basic Constitutional rights and amount to a taking of JPV's property by the City.

## THE PARTIES, JURISDICTION, AND VENUE

4.      Plaintiff Jade Pig Ventures – River Ridge, LLC is a limited liability company organized and existing under the laws of the State of Michigan with an office and primary place of business in Grand Rapids, Michigan.

5.      Defendant City of Walker is a municipal corporation organized and existing under the laws of the State of Michigan.

6.      The amount in controversy exceeds the sum of $25,000, exclusive of costs and interest, and this Court otherwise has subject matter jurisdiction over this controversy and personal jurisdiction over Defendant.

55042091.7

7.   Venue is proper in this county because Defendant is located in Kent County.

## GENERAL ALLEGATIONS

**The City Zoning Ordinance and Planned Unit Development Approval Process**

8.   In Michigan, local units of government have no inherent authority to engage in zoning, and can only act based on specific statutory authority granted by the state legislature.

9.   Michigan's Zoning Enabling Act, MCL 125.3101 *et seq.* (the "MZEA"), enables local units of government to adopt zoning ordinances, subject to certain requirements and restrictions as set forth in the MZEA.

10.   Among other requirements, the MZEA mandates that all zoning regulations shall be uniform for each class of land or buildings, dwellings, and structures within a zoning district. MCL 125.3201.  Further, under the MZEA:

   a.   A decision rejecting, approving, or conditionally approving a site plan shall be based on the requirements and standards contained in a zoning ordinance, other statutorily authorized and properly adopted local unit of government planning documents, other applicable ordinances, and state and federal statutes; and,

   b.   A site plan shall be approved if it contains the information required by the zoning ordinance and is in compliance with the conditions imposed under the zoning ordinance, other statutorily authorized and properly adopted local unit of government planning documents, other applicable ordinances, and state and federal statutes.

11.   Defendant has adopted a zoning ordinance (the "Ordinance") under the authority of the MZEA, including the adoption of certain amendments from time-to-time.  Walker Zoning Ordinance No. 71-150, adopted July 1, 1971, as amended.

12.   In connection with the Ordinance, Defendant has adopted Planned Unit Development ("PUD") Regulations, which "are intended to permit flexibility in the regulation of land development; encourage innovation in land use and variety in design, layout and type of structures constructed; achieve economy and efficiency in the use of land, natural resources,

3

55042091.7

energy and the provision of public services and utilities; encourage provision of useful open space; and provide adequate housing, employment and shopping opportunities particularly suited to the needs of the residents of the city." Ordinance Art. VIII, § 94-211.

13.     The PUD Regulations provide a framework for the submission, review, and approval of planned unit developments.

14.     The developer must apply for the necessary rezoning to ensure that the property must be properly zoned for the proposed planned unit development.   Ordinance Art. VIII, § 94-213(3)(a).  If the property has been rezoned and is appropriately classified as a PUD district, a petition to rezone is ***not required***.  *Id.*

15.     The developer must submit a Preliminary Area Site Plan ("PASP") for review and approval by the Planning Commission.  Ordinance Art. VIII, § 94-213(3).

16.     The Planning Commission must approve a PASP if the PASP complies with all applicable ordinances and statutes.  MCL 125.3501(5).

17.     Upon approval of a PASP, an applicant may apply for approval of a final area site plan ("FASP") for all or any phase of a proposed PUD shown on the approved PASP.

18.     During the application process for approval of a FASP, the Planning Commission is required to conduct a more in-depth review on each specific phase or development area proposed to be constructed.  Ordinance Art. VIII, § 94-213(6)-(7).

**JPV's Properties**

19.     JPV owns three parcels of property, approximately 49 acres, located at 740 Greenridge Drive NW, 330 Greenridge Drive NW, and 350 Greenridge Drive NW, in Walker, Michigan (collectively, the "Property"). The Property is depicted below:



20.     The Property is the location of the former Greenridge Country Club facility and golf course, which existed on the Property from 1931 until 1988, when the Property was sold to a developer.

21.     In 1989, the prior owner of the Property applied for rezoning of the Property (and surrounding parcels) from AA Agricultural to RPUD-2, High Density Residential.   The prior owner also sought approval of a PASP for a planned unit development on the Property.

22.     The City granted the prior owner's application, rezoned the Property to RPUD-2, and approved the prior owner's PASP to develop *186* residential units on the Property.  Indeed, the properties subject to the PUD are now developed with retail and multi-family developments.

55042091.7

23.     Following the City Commission's rezoning of the Property to RPUD-2 and approval of the prior owner's PASP, a select group of neighboring property owners sued the prior owner of the Property.  The City is not, and never has been, a party to that lawsuit.  The parties to that lawsuit eventually agreed upon a consent judgment requiring any future development of the Property to adhere to a 150-foot buffer along the easternmost property line against the single-family residential neighborhood.  This consent judgment is still in place today.

**JPV's Project and Submissions to the City**

24.     Over the course of the past three decades, build-out of the Property was permitted in accordance with the originally approved PASP with no issues or concerns expressed by the City.

25.     In 2021, JPV began working on a new project to develop townhomes on the Property.

26.     On October 21, 2021, JPV and its consultant, Progressive AE, met with City representatives in a pre-application conference to inform the City of JPV's proposed development plan for the Property and to ensure that JPV addressed the City's lawful and legitimate requests concerning the development.

27.     On April 6, 2022, JPV submitted a request for PASP approval.

28.     JPV's PASP proposed to develop 186 multifamily townhomes on the Property, with an overall density of 3.76 units per acre, to be known as "River Ridge Townhomes."  The PASP proposed nineteen 6-unit townhome buildings and eighteen 4-unit townhome buildings.  The PASP also included various amenities, including a dog park, private streets, private garage parking, and guest parking, preservation of steep slopes and mature trees, and landscaping.

29.     In connection with its request for PASP approval, JPV provided all information required under Section 94-213(2) of the Ordinance.

55042091.7

30.     JPV's request for PASP approval demonstrated that the PASP met all of the "preliminary area site plan requirements" under Section 94-213(2) of the Ordinance.

31.     The City subsequently provided JPV with notes for revisions it wanted made to the PASP.

32.     On April 14, 2022, JPV met with City representatives again to discuss its request for PASP approval and the City's requested revisions, many of which exceeded the Ordinance's requirements.

33.     Based upon requests from City officials, on May 4, 2022, JPV submitted an amended PASP.

34.     JPV's amended PASP provided all information required under Section 94-213(2) and demonstrated that the PASP met all of the "preliminary area site plan requirements" under Section 94-213(2) of the Ordinance and in several ways exceeded those requirements.

35.     On May 12, 2022, JPV attended a Site Plan Review Committee ("SPRC") meeting, at which time the City provided JPV with feedback for additional recommended revisions to the PASP many of which, again, exceeded the Ordinance's requirements for preliminary site plan approval.

36.     On May 18, 2022, JPV submitted a second amended PASP.

37.     JPV's second amended PASP provided all information required under Section 94-213(2) of the Ordinance and demonstrated that the PASP not only met, but exceeded, the "preliminary area site plan requirements" under Section 94-213(2).

38.     On May 23, 2022, the City requested that JPV incorporate its list of 21 additional changes or requirements in the PASP.

7

39.     The City confirmed that the River Ridge Townhomes project was a "cluster style development," so the density calculation could be a "gross density."

40.     On May 30, 2022, the City informed JPV, for the first time, that there were concerns regarding impact to any wildlife on the Property.  The City asked whether any endangered or threatened species were found on the Property.

41.     On or around May 31, 2022, the City's professional planning consultant prepared a memorandum analyzing the City's Master Plan's references to the Property.  The City's consultant's memorandum concluded that based on the Master Plan, any development on the Property should have the following characteristics:  (a) the development should be residential; (b) the residential density should be somewhere between the existing multi-family to the west and the existing single family to the east; (c) specific housing typologies should be "like against like," with multi-family buildings abutting multi-family and single family buildings abutting single family; (d) trees and hillsides should be preserved as much as possible within a specific area designated as open space; and (e) the road layout should advance the goal of creating a connection between North Center Drive to 4 Mile Road.

42.     Even though a review and consideration of the Master Plan is not necessary (or relevant), when, as here, the zoning and permitted uses have been established, JPV's PASP included all the characteristics set forth in the City's consultant's memorandum.

**The Planning Commission Tables JPV's Request for PASP Approval**

43.     On June 1, 2022, the Planning Commission held a public hearing to review JPV's second amended PASP.

44.     During this hearing, the City Planning Director provided a report on JPV's second amended PASP.

8

45.    The Planning Director's report confirmed that the Property was zoned RPUD-2, and thus the zoning was in place for JPV to move forward with its request for PASP review.

46.    Despite confirming that the Property was already properly zoned, and, as a result, the PASP's compliance with the City's Master Plan was not a relevant consideration, the City Planning Director's report confirmed that the land use was appropriate for the area per the Master Plan.

47.    The Planning Director's report further confirmed that because RPUD-2 does not have a "minimum open space requirement," the amount provided by JPV was acceptable and was also what kept the overall density under 4 units per acre.

48.    That said, the Planning Director's report determined that the 21 items requested by the City at the May 12, 2022 SPRC meeting to be added to or changed on the PASP had supposedly not been addressed.

49.    As a result, the Planning Director recommended that the Planning Commission table any action on JPV's proposed PASP until those items had been addressed.

50.    The Planning Commission took the Planning Director's recommendation and tabled JPV's request for approval of the PASP.

51.    The Planning Commission determined that JPV must revise, add, or correct the items addressed in the Planning Director's report.

52.    The Planning Commission determined that JPV must provide even more information, including: a current topographic survey; an overall stormwater impact analysis; an analysis conducted by the Kent County Drain Commission; a wetland delineation; a traffic impact analysis; a private well analysis; and an endangered species analysis.

9

55042091.7

53.     The Planning Commission required JPV to provide more information on the history of events and development that had significantly impacted the Alpine-Walker Drain.

54.     Despite confirming that the City was not a party to the 1989 consent judgment and thus could not enforce a lawsuit that it was not involved in, the Planning Commission required JPV's PASP to recognize the 150-foot buffer prescribed by the 1989 consent judgment and to remove all proposed storm detention basins from that buffer.

55.     Nothing in the 1989 consent judgment prohibits stormwater detention basins from being placed in the 150-foot buffer. The 1989 consent judgment merely provides that no buildings or other physical facilities may be located in the buffer.

56.     The Planning Commission determined that JPV must hold a neighborhood meeting before being placed on future Planning Commission agenda.

57.     Finally, the Planning Commission determined that a public work session should be held with JPV about the PASP.

58.     On June 8, 2022, JPV held a neighborhood outreach meeting.

59.     On June 20, 2022, JPV hosted the Planning Commissioners on a site visit on the Property, which was followed up by a work session with City staff, the Planning Commissioners, and JPV.

60.     On December 1, 2022, JPV and Progressive AE met with representatives of the Kent County Drain Commission and confirmed their alignment on the proposed Property layout with respect to stormwater.

61.     On December 14, 2022, JPV and Progressive AE met with representatives of the Kent County Drain Commission, Alpine Township, and the City to discuss issues including stormwater impact and impacts on drains on the Property.

55042091.7

62.    On December 15, 2022, JPV and Progressive AE met with City representatives in another pre-application conference to inform the City of JPV's revised PASP before the February 1, 2023 Planning Commission public hearing on JPV's request for PASP approval.

63.    On January 18, 2023, JPV submitted a third amended PASP.

64.    JPV's third amended PASP proposed seventeen 6-unit buildings and twenty-one 4-unit buildings, with an overall density of 3.76 units per acre.

65.    JPV's third amended PASP provided all information required under Section 94-213(2) and demonstrated that the PASP met all of the "preliminary area site plan requirements" under Section 94-213(2) of the Ordinance. Indeed, the third amended PASP exceeded the Ordinance requirements in several ways.

66.    JPV's third amended PASP included a Trip Generation Analysis letter prepared by Progressive AE, which showed that the development would generate minimal impact on existing traffic operations along adjacent roadways.

67.    JPV's third amended PASP included an Information for Planning and Consultation ("IPaC") preliminary report prepared using data from the U.S. Fish and Wildlife Service.  The IPaC showed that there are no critical habitats on the Property.

**The Planning Commission Tables JPV's Request for a Second Time**

68.    On February 1, 2023, the Planning Commission held a public hearing on JPV's request for approval of the third amended PASP.

69.    Despite JPV's insistence that the Planning Commission decide on its request for approval of the third amended PASP, the Planning Commission once again tabled JPV's request and demanded that even more conditions be met.

11

70.     To further delay action on the third amended PASP, the Planning Commission requested a formal legal interpretation from the City Attorney about its role in applying the 1989 consent judgment between private entities, required JPV to provide more hydrology and hydraulic information regarding existing and project-related stormwater, flood control, and private water well impacts, and directed JPV to develop water well information with the Kent County Drain Commission.

71.     Although JPV had provided the Trip Generation Analysis letter, showing that the development would generate minimal impact on traffic, the Planning Commission required JPV to provide a full scale and comprehensive traffic study.

72.     Although JPV provided the IPaC, reflecting that there are no critical habitats on the Property, the Planning Commission required JPV to provide a new endangered species report, which must be generated through contact with the Michigan Department of Natural Resources.

73.     The Planning Commission also required JPV to provide additional wetland survey information, to be confirmed by EGLE and a new plan sheet showing existing forest cover.

74.     The Planning Commission determined that JPV's request for approval of the third amended PASP would remain tabled until JPV satisfied the City's conditions and submitted requested documentation.

75.     On February 13, 2023, the City passed a Parks and Recreation Master Plan, identifying the Property as a "potential land acquisition" for the City to purchase to grow current parks and trails for neighborhood connections to recreation and natural areas and increase park land.

76.     On August 23, 2023, Progressive AE met with representatives of the City to discuss all of the City's newly imposed requirements.  Progressive AE and City representatives aligned on many of the open items.

77.     For example, JPV had obtained preliminary approval of storm water drainage arrangements from the Kent County Drain Commissioner.

78.     The City informed Progressive AE that a letter from MDOT saying the projected traffic impacts were acceptable could negate need for any other traffic study and the IPaC analysis submitted thus far was likely sufficient to respond to the City's request for an endangered species survey.

79.     Progressive AE asked to have the application placed back on the Planning Commission agenda as soon as possible, and was informed that the third amended PASP would be placed back on the agenda for the October meeting of the Planning Commission.

80.     On September 7, 2023, a representative of MDOT concurred with the findings of Progressive AE's Trip Generation Analysis for the River Ridge Townhomes project.

**The City Adopts an "Emergency" Moratorium, Blocking JPV's Request**

81.     Before the October meeting, and to the surprise of JPV and Progressive AE, the City adopted an "emergency" ordinance to impose a moratorium on the issuance of any zoning approvals, rezonings, permits, variances, licenses, or other similar approvals for designated properties (the "Moratorium").  The timing of the "emergency" ordinance and the fact that JPV was not provided notice until the day of the meeting, when it discovered the action through other sources, demonstrate that the Moratorium was targeted to block JPV's application.

13

82.     JPV, through its counsel, submitted a letter to the City in an effort to dissuade City from imposing the Moratorium, to no avail.   (**Ex. A**, September 11, 2023 Letter re: Proposed Ordinance No. 23-672.)

83.     The Moratorium prohibited the approval or issuance of any City permit, zoning compliance permit, license, zoning approval, rezoning, variance or similar or other approval for any residential development of land at a proposed density of 3.5 or more units per acre.

84.     The Moratorium was aimed at JPV and caused JPV's application to be removed from the October Planning Commission meeting agenda.

85.     The Moratorium included supposed findings that the City was in process of amending large portions of the Ordinance, and that the City was undertaking targeted Master Plan updates to be substantially completed by March 2024, which are to include the consideration of designating certain higher-density developments as recommended for special exception reviews as well as clarifying and interpreting future land use maps and developing associated text for higher-density residential areas.

86.     Nothing about the Moratorium suggested there was any "emergency"; the City completed a full revision to its Master Plan in or around October 2020.  The only "emergency" was that JPV's application was scheduled to be considered at the upcoming Planning Commission meeting.

87.     The Moratorium was to remain in effect for six months.

88.     On October 18, 2023, JPV submitted a fourth amended PASP to remove units and buildings.  The modifications to the PASP brought the density below the threshold for the Moratorium.

14

89.     JPV's fourth amended PASP also included a revised wetland delineation; MDOT's confirmation of the findings set forth in Progressive AE's Trip Generation Analysis letter; confirmed that there would be no major impact on the Alpine-Walker Drain; noted the Kent County Drain Commission's approval of JPV's stormwater management approach; and included a soil asbestos testing report, showing a lack of asbestos.

90.     On October 26, 2023, Progressive AE again met with City staff.  The City did not push back on JPV's reasoning for not providing a full traffic study, and noted that there would be fewer impacts since JPV had reduced the number of units.  The City confirmed that a private well analysis need not be conducted because soil testing had confirmed that no asbestos was found in the soil.

91.     JPV submitted a fifth amended PASP on November 20, 2023.

92.     Taking no chances, JPV hosted another meeting with neighbors to discuss changes to the PASP and the dramatic decrease in units and density.

93.     Following several meetings with City staff, JPV's request for PASP approval was placed back on the Planning Commission meeting agenda and was scheduled to be considered at the December 6, 2023 Planning Commission meeting.

94.     On December 4, 2023, after receiving and incorporating input from local residents and City staff, JPV submitted a sixth amended PASP.

95.     JPV's sixth amended PASP proposed 162 units in 27 4-unit buildings and nine 6-unit buildings, with an overall density of 3.42 units per acre.

96.     JPV's sixth amended PASP included:  a current topographic survey; stormwater impact analysis conducted to the satisfaction of the Kent County Drain Commissioner and the City

15

Engineer; an understanding of the impacts to the Alpine-Walker Drain; and a wetland delineation report and a wetland boundary verification letter.

97.     JPV's sixth amended PASP also referenced MDOT's email concurring with Progressive AE's Trip Generation Analysis; that private well analysis was not conducted because the spoil pile on site was tested and it was confirmed that no asbestos was found; and that the IPaC study through the U.S. Fish and Wildlife Service was provided to City staff, who determined that it was sufficient.

98.     JPV's sixth amended PASP provided all information required under Section 94-213(2) and demonstrated that the PASP exceeded all of the "preliminary area site plan requirements" under Section 94-213(2) of the ordinance.

**The Planning Commission Tables JPV's Request for a Third Time**

99.     On December 6, 2023, the Planning Commission held a third public hearing on JPV's request for PASP approval.

100.    To the surprise of JPV, the first part of the Planning Commission meeting involved a debate over whether the density was properly calculated, whether the project constitutes a "cluster development," and whether the project should be included in the Moratorium.

101.    This was a surprise because the City had previously designated the project as a cluster development and had established the density calculation for the project in May 2022.

102.    Moreover, the Planning Commission's meeting agenda did not reference the consideration of these questions.  As a result, JPV had no notice these questions would be discussed and was unable to prepare for the discussion.

103.    Ultimately, after passionate discussion, a majority of the Planning Commission voted that the project was a cluster development, that the density calculation was correct, that the

16

project was not subject to the Moratorium, and that consideration of JPV's application could proceed.

104. Yet for the third time, the Planning Commission tabled JPV's request for PASP approval despite JPV's repeated requests for a decision.

105. This time, the Planning Commission tabled the request pending completion of a supposed analysis of the proposed PASP's compliance with the City's Master Plan, to be performed jointly by the Master Plan Consultant, Community Development Department, and the City Attorney. This was in spite of the fact that JPV had established how the PASP had always complied with the Master Plan and had been repeatedly changed in response to comments to even better comply with the Master Plan, even though JPV asserted that the PASP's compliance was not even a relevant determination.

106. Taking no chances, on January 2, 2024, JPV submitted additional analysis that specifically addressed the PASP's compliance with the City's Master Plan and how the PASP greatly exceeded the standards that had been previously provided to JPV by the City's planning consultant, despite the fact that JPV's PASP's compliance with the Master Plan was irrelevant at this stage.

107. On January 7, 2024, JPV submitted a seventh amended PASP, which addressed feedback from the Planning Commission and included detailed site grading and utility plans, shifting of storm water retention areas, shifting of cul de sacs, and repositioning of buildings to avoid facing the residential community.

108. JPV's seventh amended PASP ultimately included, among other things:

   a. A current topographic survey;

   b. A stormwater impact analysis, approved by the Kent County Drain Commission;

17

55042091.7

c.  A winter wetland delineation report, a new grow season wetland delineation report, and a wetland boundary verification letter;

d.  Progressive AE's Trip Generation Analysis letter, showing that the development would generate minimal impact on traffic;

e.  The IPaC, reflecting that there are no critical habitats on the Property;

f.  An asbestos testing report, showing no asbestos in the soil on the Property; and

g.  A plan sheet showing existing tree cover on the Property.

109.  JPV's seventh amended PASP provided all information required under Section 94-213(2) and demonstrated that the PASP exceeded all of the "preliminary area site plan requirements" under Section 94-213(2).

110.  The City's Planning Department determined that JPV's seventh amended PASP satisfied the requirements for PASP approval under the Ordinance.

111.  The City Engineer Department determined that JPV's seventh amended PASP satisfied the requirements for PASP approval under the Ordinance.

112.  The Kent County Drain Commissioner and MDOT determined that JPV's seventh amended PASP satisfied the requirements for PASP approval under the Ordinance.

**The Planning Commission Denies JPV's Request**

113.  On January 17, 2024, the Planning Commission held another meeting and considered JPV's PASP.

114.  During the meeting, Frank Wash, the City's assistant manager, raised new supposed concerns about JPV's stormwater analysis for the very first time and claimed that he now somehow couldn't "defend the engineering on your project" despite City staff previously approving those plans.

18

55042091.7

115.    The Planning Commission found that JPV's seventh amended PASP "does conform to the intent and to all regulations and standards of the Zoning Ordinance, as applicable."

116.    But the motion to grant tentative approval of JPV's seventh amended PASP failed in a tie vote with four members in favor and four members against.   As a result, the Planning Commission made and passed a motion to table the PASP once more, to the Planning Commission's next meeting when all nine members of the Planning Commission would be present.

117.    After JPV's representatives left the January 17, 2024 meeting, Mr. Wash also warned members of the Planning Commission that he was "uncomfortable with a tentative approval" of the PASP, claimed he did not know how the Planning Commission would get out of the development if the PASP was approved with conditions, and stated that a tentative denial of the PASP was "pretty easy."

118.    On February 7, 2024, the Planning Commission held another meeting to consider JPV's PASP.

119.    The Planning Commission determined that JPV's seventh amended PASP did not comply with the City's Master Plan, even though JPV's PASP's compliance with the Master Plan was not a necessary or relevant consideration given that the Property had previously been rezoned.

120.    The Planning Commission determined that JPV's seventh amended PASP did not comply with the City's Master Plan, even though it was agreed that the objective provisions of the Master Plan, with respect to density and use, were satisfied.

121.    The Planning Commission denied JPV's request for approval of the seventh amended PASP in a five to four vote, despite the fact that JPV's PASP met and exceeded the Ordinance's requirements for preliminary site plan approval.

**The City's Decision Contradicts Its Own Precedent**

122.    The City has approved PASPs for larger, more impactful projects, which had significantly higher density.

123.    For example, in or around March 2021, the City approved a PASP for a 552-unit multi-family development on the property formerly known as the English Hills Golf Course.

124.    The English Hills Golf Course site is approximately 140 acres.

125.    The overall density of the English Hills Golf Course redevelopment project was approximately 3.87 units per acre.

126.    The English Hills Golf Course redevelopment project required the submission of a rezoning request for one of the involved properties, from AA to RPUD-2, which the City Commission approved.

127.    The City did not require the applicant to provide an endangered species analysis, a well study, or a tree survey in connection with the English Hills Golf Course redevelopment project.

128.    For another example, in or around September 2021, the City approved a PASP for a 318-unit commercial, single family residential and multi-family residential planned unit development, called "Waterford Village."

129.    The Waterford Village project site is approximately 105 acres, and was formerly used as a golf course.

130.    The overall density of the proposed RPUD-2, multifamily residential portion of the Waterford Village project was approximately 6.74 units per acre.

131.     The Waterford Village project required the submission of a rezoning request for the involved properties, from AA to RPUD-1, RPUD-2, and CPUD, which the City Commission approved.

132.     The City did not require the applicant to provide an endangered species analysis, a well study, or a tree survey in connection with the Waterford Village project.

133.     Following the approval of the PASP for Waterford Village, the Planning Commission required the applicant to provide a comprehensive drainage study to confirm "zero impact" from the proposed development on adjacent properties.

134.     The project sites for the English Hills Golf Course redevelopment and the Waterford Village are former golf courses, like the Property, yet the City approved the PASPs for these projects and denied JPV's request for PASP approval.

135.     The English Hills Golf Course redevelopment project and the Waterford Village project cover more than double the acreage of the River Ridge Townhomes project, yet the City approved the PASPs for these projects and denied JPV's request for PASP approval.

136.     The English Hills Golf Course redevelopment project and the Waterford Village project provided for development of significantly more units than the River Ridge Townhomes project, yet the City approved the PASPs for these projects and denied JPV's request for PASP approval.

137.     The overall density of the multifamily residential portions of the English Hills Golf Course redevelopment project and the Waterford Village project was significantly higher—more than double—than that of the River Ridge Townhomes project, yet the City approved the PASPs for these projects and denied JPV's request for PASP approval.

55042091.7

138.    The English Hills Golf Course redevelopment project and the Waterford Village project required rezoning of the properties, whereas the River Ridge Townhomes project did not, yet the City approved the PASPs for these projects and denied JPV's request for PASP approval.

139.    The City did not require the applicants in the English Hills Golf Course redevelopment project or the Waterford Village project to provide an endangered species analysis, a well study, or a tree survey, yet the City required JPV to present this information.

140.    The City did not require the applicant in the Waterford Village project to provide a comprehensive drainage study prior to approving the PASP, yet the City required JPV to provide a comprehensive drainage study before it would approve or deny JPV's PASP.

**The City's Denial of Approval**

141.    Under Michigan law, the City is required to approve a PASP submitted in compliance with its zoning ordinance and other applicable law.

142.    The City improperly required JPV's PASP to comply with its Master Plan, which is required on a petition for rezoning—*not* a request for approval of a PASP.

143.    Even if conformance with the City's Master Plan was a relevant consideration on JPV's request for approval, JPV demonstrated the PASP's conformance with the Master Plan.

144.    The City improperly required JPV to present evidence regarding certain characteristics of the proposed development as set forth under Section 94-213(3)(e), which are required on a petition for rezoning—*not* a request for approval of a PASP.

145.    Specifically, the City improperly required JPV to present stormwater drainage reports and studies and wetlands delineation reports.

146.    Even if the characteristics set forth under Section 94-213(3)(e) did apply to JPV's PASP, JPV presented evidence to satisfy those characteristics.

22

147.   The City also improperly required JPV to present reports or information on additional characteristics not found anywhere in Section 94-213, including:  a full scale and comprehensive traffic study, an endangered species report, and a private well analysis.

148.   Moreover, when JPV did provide information requested by the City—often at JPV's significant time and expense—the City repeatedly moved the goal posts by requiring new information and reports.

149.   The City's February 2023 identification of the Property as a "potential land acquisition" to increase park land makes clear that the City never intended to approve JPV's PASP and would block any proposed development of the Property.

150.   Because JPV's PASP complies with all specific requirements of the PUD Regulations in the Ordinance, JPV is entitled to approval of the PASP as a matter of law.

151.   The City's failure to act on the PASP, as set forth above, violates JPV's right to substantive due process and equal protection, under state and federal law.

152.   In addition to violating the Ordinance, the City's failure to approve the PASP is unlawful under the MZEA for at least the following reasons:

   a.    Under the MZEA, a decision rejecting, approving, or conditionally approving a site plan shall be based on the requirements and standards contained in a zoning ordinance, other statutorily authorized and properly adopted local unit of government planning documents, other applicable ordinances, and state and federal statutes, and the City's actions in this case violate that mandate, MCL 125.3501(4);

   b.    Under the MZEA, a site plan must be approved if it contains the information required by the zoning ordinance and is in compliance with the conditions imposed under the zoning ordinance, other statutorily authorized and properly adopted local unit of government planning documents, other applicable ordinances, and state and federal statutes, MCL 125.3501(5).

153.   JPV has been irreparably harmed and has no adequate remedy at law as a result of the City's breach of its duties because JPV is unable to lawfully use and develop its properties as

23

anticipated by state law and the Ordinance, in addition to suffering ongoing economic harm as a result of the City's breach.

## COUNT I – DECLARATORY JUDGMENT

154.    JPV repeats and realleges the foregoing paragraphs as if fully set forth herein.

155.    "In a case of actual controversy within its jurisdiction, a Michigan court of record may declare the rights and other legal relations of an interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted." MCR 2.605(A)(1).

156.    There is an actual controversy here because JPV contends that the City has deprived it of the rights protected by the Michigan and United States Constitutions under the color of law.

157.    The City has refused to approve JPV's seventh amended PASP.

158.    JPV's seventh amended PASP meets all City of Walker Ordinances in effect at the time of its submission and included all the information required under Section 94-213.

159.    Approval of JPV's seventh amended PASP is not discretionary if the request meets the standards cited in the Ordinance.

Wherefore, JPV respectfully requests that this Court determine, declare and adjudge:

a.    That the City's actions constitute a violation of state and local laws, ordinance and practices, including MCL 125.3501, the Ordinance, and JPV's constitutional rights, including rights to substantive due process and equal protection; and

b.    JPV is entitled to approval of the seventh amended PASP.

## COUNT II – SUPERINTENDING CONTROL

160.    JPV repeats and realleges the foregoing paragraphs as if fully set forth herein.

161.    For the reasons set forth above, the City has deprived JPV of the rights protected by the Michigan and United States Constitutions under the color of law.

162.    The City has refused to approve JPV's seventh amended PASP.

24

55042091.7

163.    JPV's seventh amended PASP meets all City of Walker Ordinances in effect at the time of its submission and included all the information required under Section 94-213.

164.    Approval of JPV's seventh amended PASP is not discretionary if the request meets the standards cited in the Ordinance.

165.    The City Planning Commission is subject to superintending control by this Court.

166.    JPV does not have another specific legal remedy without the aid of an order of superintending control.

Wherefore, JPV respectfully requests that this Court enter judgment granting it:

      a.    An order requiring the City, and its applicable boards, commissions, and personnel, to approve JPV's seventh amended PASP;

      b.    JPV's costs, including attorneys' fees; and

      c.    Any additional relief as this Court deems just, equitable, and proper.

## COUNT III – SUBSTANTIVE DUE PROCESS VIOLATION

167.    JPV repeats and realleges the foregoing paragraphs as if fully set forth herein.

168.    The United States Constitution and the Michigan Constitution provide that no person shall be deprived of life, liberty, or property, without due process of law.  US Const amend V, XIV; Mich Const art 1, § 17.

169.    JPV has a protected interest in the use that is permitted by the RPUD-2 zoning classification.

170.    There is no rational basis for the City's refusal to approve JPV's seventh amended PASP.

171.    The City's refusal to approve JPV's seventh amended PASP was arbitrary and capricious and deprived JPV of its right to substantive due process under the United States and Michigan Constitutions.

172. The City's failure to comply with its own Ordinance, and otherwise comply with law, was arbitrary and capricious and deprived JPV of its right to substantive due process under the United States and Michigan Constitutions.

173. In depriving JPV of its right to substantive due process, the City acted maliciously and willfully, with callous indifference to JPV's protected right.

174. The City's actions have caused JPV to suffer irreparable harm, effectively depriving JPV of the right to engage in the development of its property and threatening the economic prospects of JPV.

175. JPV is entitled to relief pursuant to 42 U.S.C. § 1983.

Wherefore, JPV respectfully requests that this Court enter judgment granting it:

    a. A declaration that the acts described above violated JPV's right to substantive due process under the Constitution of the United States and the Michigan Constitution;

    b. A declaration that JPV's seventh amended PASP meets all of the relevant standards for approval;

    c. Damages;

    d. JPV's costs, including attorneys' fees pursuant to 42 U.S.C. § 1988; and

    e. Any additional relief as this Court deems just, equitable, and proper.

**COUNT IV – TAKINGS**

176. JPV repeats and realleges the foregoing paragraphs as if fully set forth herein.

177. Article X, § 2 of the Michigan Constitution restricts the government from taking property for a public use without the payment of just compensation.

178. Under the Fifth Amendment to the United States Constitution, as it applies to the states through the Fourteenth Amendment, the government also may not take property for a public use without the payment of just compensation.

55042091.7

179. A zoning ordinance as applied or on its face or other municipal actions may effect a taking of property through inverse condemnation.

180. The City has systematically and intentionally taken measures against JPV to prevent the development of its Property in accordance with its rights, to the detriment of JPV and the general public interest in compliance with existing ordinances.

181. The City's actions, as detailed above, have gone beyond mere regulation and have effectuated a taking of JPV's protected property interests.

182. JPV has reasonable investment-backed interests with which the City has substantially interfered.

183. The City's calculated and intentional attempts to delay and block JPV's development of the Property have been extraordinary and exceed any normally expected delays in the site plan approval process.

184. The actions taken by the City have had significant economic impact on JPV, which impact continues and grows.

185. It is clear from the history of the City's actions that no amount of reports or information would have been sufficient for the City to approve the PASP. Indeed, it is clear from the City's actions that there is no townhomes project that could have been developed on the Property with the permitted density that would have been approved by the City. As such, the City's actions result in a total loss of the value of the project.

186. The actions taken, as set forth above, are contrary to law.

187. JPV is entitled to relief pursuant to 42 U.S.C. § 1983.

188. Accordingly, JPV is entitled to compensation for the temporary or permanent taking of its properties.

55042091.7

Wherefore, JPV respectfully requests that this Court enter judgment granting it:

    a.    Damages to compensate JPV for the permanent or temporary taking of its property;

    b.    JPV's costs, including attorneys' fees pursuant to 42 U.S.C. § 1988; and

    c.    Any additional relief as this Court deems just, equitable, and proper

## COUNT V – EQUAL PROTECTION VIOLATION

189.    JPV repeats and realleges the foregoing paragraphs as if fully set forth herein.

190.    The Fourteenth Amendment of the United Stated Constitution and Article I, Section 2 of the Michigan Constitution guarantee citizens equal protection of the laws.

191.    The City's refusal to approve JPV's seventh amended PASP was arbitrary and invidious and violates JPV's rights to equal protection under the Fourteenth Amendment to the United States Constitution and Article I, Section 2 of the Michigan Constitution.

192.    JPV were treated differently by the City from other similarly situated applicants seeking PASP approval.

193.    The City has approved other, far larger and more impactful, PASPs without requiring those applicants to submit drainage studies, endangered species analyses, well studies, or tree surveys.

194.    The City intentionally and arbitrarily discriminated against JPV, denying approval of JPV's seventh amended PASP despite its satisfaction of the City's criteria for approval. This discrimination, based on unconstitutional preferential treatment of similarly situated individuals, lacks a rational basis, fails to reasonably advance a legitimate governmental interest, and is motivated by an illegitimate animus or ill will towards JPV.

195.    JPV is entitled to relief pursuant to 42 U.S.C. § 1983.

Wherefore, JPV respectfully requests that this Court enter judgment granting it:

a.  A declaration that the acts described above violated JPV's right to equal protection under the United States Constitution and the Michigan Constitution;

b.  A declaration that JPV's seventh amended PASP meets all of the relevant standards for approval;

c.  Damages;

d.  JPV's costs, including attorneys' fees pursuant to 42 U.S.C. § 1988; and

e.  Any additional relief as this Court deems just, equitable, and proper.

Respectfully submitted,

HONIGMAN LLP
Attorneys for Plaintiff

By: _____

Michael P. Hindelang (P62900)
Brandon J. Wilson (P73042)
Laura E. Biery (P82887)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
(313) 465-7000

Dated:  March 8, 2024

# EXHIBIT A

# HONIGMAN

Honigman Miller Schwartz and Cohn LLP
Attorneys and Counselors

J. Patrick Lennon

(269) 337-7712
Fax: (269) 337-7713
Lennon@honigman.com

September 11, 2023

Deborah Goudy, City Clerk
City of Walker
4243 Remembrance Road NW
Walker, MI 49534

**Re: Proposed Ordinance No. 23-672**

Dear Ms. Goudy,

This firm represents Jade Pig Ventures – River Ridge LLC and its related affiliates (together, "Jade Pig").

We are writing to formally object to, and express our opposition to, the proposed "emergency" ordinance to impose a moratorium on the issuance of any building permits, demolition permits, land divisions, land combinations, lot line adjustments, or other similar approvals for Developments with a proposed density of three and a half (3.5) or more units per acre.  (Proposed Ordinance No. 23-672, the "Emergency Moratorium").  To our surprise, the Emergency Moratorium would apply not only to new applications, but also to applications that have already been submitted.

As the City well knows, Jade Pig has been working on a new project for its property located at 740 Greenridge Drive (the "Development") for approximately two years.  Jade Pig first met with the City representatives for a pre-application meeting on October 21, 2021, and submitted its first Preliminary Area Site Plan ("PASP") on April 6, 2022.  **Jade Pig has pursued this development in good faith and at great expense, including through numerous public hearings and meetings with City officials described in more detail below.**

Jade Pig was surprised and dismayed to learn this morning—the day of the meeting—that the City Commission will consider imposing the Emergency Moratorium tonight.  Despite working hand-in-hand with Jade Pig on the Development for nearly two years, **no one at the City notified Jade Pig of the proposed Emergency Moratorium which based on the documentation appears to have been under consideration for some time.  It is disappointing that, despite multiple calls, emails, and a recent in-person meeting between Jade Pig representatives and City officials, the City never mentioned the Emergency Moratorium.**

The circumstances suggest that the failure to notify Jade Pig was no accident.  The City knows that Jade Pig asked to have its application considered at the October 18, 2023 Planning Commission meeting and, after nearly two years of effort, was hoping to obtain a preliminary site plan approval at that time.  This, combined with the fact that the Emergency Moratorium appears

350 East Michigan Avenue · Suite 300 · Kalamazoo, Michigan 49007-3800
*Detroit · Lansing · Oakland County · Ann Arbor · Kalamazoo*

49330009.3

to have been carefully crafted to include the Development[1], signals that a purpose of the Emergency Moratorium is to block and/or delay the Planning Commission's consideration of the Development.

Importantly, there is no "emergency" necessitating the consideration of the Emergency Moratorium. If there is an emergency at all, it is the need for exactly the type of housing the Development would provide[2]. The City knows there is a dire need for additional housing and the need was known at the time the existing Master Plan was approved. As such, there is no need (much less legal grounds) to delay (much less stop) progress on new housing projects.

Instead, the purported justification for the Emergency Moratorium is the need for "more detailed interpretations of the City's adopted Master Plan." **Remarkably, the Master Plan is a ten-year plan that was adopted less than three years ago (October 26, 2020)**.

With respect to the Development, the City knows that the elements that serve as the so-called "emergencies" have been, or are being, addressed: (1) "watershed sustainability and stormwater concerns"; (2) "an enhanced need for buffers for adjacent parcels at lower density levels"; and (3) "future road development needs and infrastructure requirements". As such, a moratorium, much less an Emergency Moratorium, is not reasonable or necessary – particularly with respect to the Development.

In addition, **the City must know that it is highly unusual for a moratorium to apply to pending applications**. As the City is well aware, Jade Pig has gone to great lengths to address concerns surrounding the Development for nearly two years. If memories must be jogged, please recall that Jade Pig has submitted its preliminary site plan three times, met with City officials on numerous occasions (most recently on August 23), participated in multiple planning commission meetings, hosted a site visit and community outreach and has participated in work sessions. **It is remarkable that the City would consider a moratorium approximately one month before a planning commission hearing that should have resulted in preliminary approval of the Development after nearly two years of work and great expense.**

If the City adopts the moratorium it will find itself on legal thin ice. Based on the facts and circumstances that have lead up to this decision, there may be grounds to contend that the moratorium is invalid because zoning actions based on capitulation to public pressure, rather than governing law, routinely are invalidated. *See, e.g., Nickola v Grand Blanc Twp*, 47 Mich App 684 (1973).

---

[1] The Emergency Moratorium applies only to "the residential development of land at a proposed density of three and a half (3.5) or more units per acre." The Development has a proposed density of three point seven nine (3.79) units per acre.
[2] Housing NEXT's 2020 Housing Needs Assessment (July 13, 2020) was available and widely shared with communities throughout Kent county at the time of the Master Plan. At that time, the housing demand was roughly 22,000 units. Since then, it has only grown, and housing demand in Kent County today is roughly 35,000 units.

350 East Michigan Avenue · Suite 300 · Kalamazoo, Michigan 49007-3800
*Detroit · Lansing · Oakland County · Ann Arbor · Kalamazoo*

49330009.3

Jade Pig hopes further legal review of these actions is not necessary.  To that end, Jade Pig urges the City Council to deny the moratorium, or at a minimum, except pending applications from the moratorium and allow them to proceed.

The foregoing is not a complete statement of Jade Pig's objections to the Emergency Moratorium and to the procedure by which it is being proposed.  As stated above, Jade Pig had no notice of the City's actions until earlier today and it's analysis of its rights is ongoing and all of its rights are expressly reserved.

A representative from our Firm will attend the City Council meeting and formally object to the City's action at the meeting this evening. In the meantime, direct any questions to the undersigned.

Sincerely,

HONIGMAN MILLER SCHWARTZ AND COHN LLP

*/s/ J. Patrick Lennon*

J. Patrick Lennon

cc: Jeff Slugget

---

**350 East Michigan Avenue · Suite 300 · Kalamazoo, Michigan 49007-3800**
*Detroit · Lansing · Oakland County · Ann Arbor · Kalamazoo*

49330009.3