UNITED STATE DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JADE PIG VENTURES – RIVER
RIDGE, LLC,

      Plaintiff,

-vs-                           Case No:  1:24-cv-382
                                    Honorable Jane M. Beckering

CITY OF WALKER,

      Defendant.

_____

**DEFENDANT'S ANSWER TO PLAINTIFF'S COMPLAINT,
AFFIRMATIVE DEFENSES AND JURY DEMAND**

      Defendant, City of Walker, by and though its attorneys, Plunkett Cooney, and for its Answer to

Plaintiff's Complaint, states as follows:

      1.      JPV owns parcels of land in the City of Walker that it has proposed to develop into a residential community – a development the City admits is one of the "right" and which conforms in every way with the City's own ordinance. But because of irrational biases among certain City staff and Planning Commission members, fueled by a desire to please a pack of neighbors opposing any development of JPV's property, the proposed development was apparently dead on arrival.

**ANSWER:**      **It is admitted that Plaintiff owns parcels of land in the City of Walker. The**

**remaining allegations contained in the paragraph 1 are denied as untrue.**

      2.      Since JPV submitted its preliminary area site plan to the City more than two years ago, JPV has followed every ordinance and every lawful requirement of the City. Despite JPV meeting every requirement for having its preliminary site plan approved, and despite the acknowledgement by City representatives that JPV's proposed site plan meets all requirements and is simply the "first stop" in the process, the City refused to follow its own ordinances and refused to even approve the proposed *preliminary* site plan.

**ANSWER:**      **The allegations contained in paragraph 2 are denied as untrue.**

      3.      Contrary to the express intent of the applicable zoning district "to encourage more imaginative and livable housing environments within that district," the City has engaged in a scheme to unlawfully obstruct JPV's lawful development of its property in violation of Michigan law, the City's own ordinance, and JPV's constitutional rights. The City's improper actions have caused significant

financial damages to JPV, violated JPV's basic Constitutional rights and amount to a taking of JPV's property by the City.

**ANSWER:**   **The allegations contained in paragraph 3 are denied as untrue.**

## THE PARTIES, JURISDICTION, AND VENUE

4.     Plaintiff Jade Pig Ventures — River Ridge, LLC is a limited liability company organized and existing under the laws of the State of Michigan with an office and primary place of business in Grand Rapids, Michigan.

**ANSWER:**   **The Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 4.**

5.     Defendant City of Walker is a municipal corporation organized and existing under the laws of the State of Michigan.

**ANSWER:**   **Admitted.**

6.     The amount in controversy exceeds the sum of $25,000, exclusive of costs and interest, and this Court otherwise has subject matter jurisdiction over this controversy and personal jurisdiction over Defendant.

**ANSWER:**   **It is admitted that this court has jurisdiction over this matter. The Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 6.**

7.     Venue is proper in this county because Defendant is located in Kent County.

**ANSWER:**   **It is admitted that the United States District Court for the Western District of Michigan is the proper venue.**

## GENERAL ALLEGATIONS
### The City Zoning Ordinance and Planned Unit Development Approval Process

8.     In Michigan, local units of government have no inherent authority to engage in zoning, and can only act based on specific statutory authority granted by the state legislature.

**ANSWER:**   **Admitted.**

9.     Michigan's Zoning Enabling Act, MCL 125.3101 *et seq.* (the "MZEA"), enables local units of government to adopt zoning ordinances, subject to certain requirements and restrictions as set forth in the MZEA.

**ANSWER:**     **Admitted.**

10.     Among other requirements, the MZEA mandates that all zoning regulations shall be uniform for each class of land or buildings, dwellings, and structures within a zoning district. MCL 125.3201. Further, under the MZEA:

a.     A decision rejecting, approving, or conditionally approving a site plan shall be based on the requirements and standards contained in a zoning ordinance, other statutorily authorized and properly adopted local unit of government planning documents, other applicable ordinances, and state and federal statutes; and,

b.     A site plan shall be approved if it contains the information required by the zoning ordinance and is in compliance with the conditions imposed under the zoning ordinance, other statutorily authorized and properly adopted local unit of government planning documents, other applicable ordinances, and state and federal statutes.

**ANSWER:**     **It is admitted that the MZEA mandates the uniformity of zoning regulations. It is further admitted that "planning documents" includes the master plan.**

11.     Defendant has adopted a zoning ordinance (the "Ordinance") under the authority of the MZEA, including the adoption of certain amendments from time-to-time. Walker Zoning Ordinance No. 71-150, adopted July 1, **1971,** as amended.

**ANSWER:**     **Admitted.**

12.     In connection with the Ordinance, Defendant has adopted Planned Unit Development ("PUD") Regulations, which "are intended to permit flexibility in the regulation of land development; encourage innovation in land use and variety in design, layout and type of structures constructed; achieve economy and efficiency in the use of land, natural resources, energy and the provision of public services and utilities; encourage provision of useful open space; and provide adequate housing, employment and shopping opportunities particularly suited to the needs of the residents of the city." Ordinance Art. VIII, § 94-211.

**ANSWER:**     **Admitted.**

13.     The PUD Regulations provide a framework for the submission, review, and approval of planned unit developments.

**ANSWER:**     **Admitted.**

14. The developer must apply for the necessary rezoning to ensure that the property must be properly zoned for the proposed planned unit development. Ordinance Art. VIII, § 94-213(3)(a). If the property has been rezoned and is appropriately classified as a PUD district, a petition to rezone is **not required. Id.**

<u>**ANSWER:**</u>     **Admitted.**

15. The developer must submit a Preliminary Area Site Plan ("PASP") for review and approval by the Planning Commission. Ordinance Art. VIII, § 94-213(3).

<u>**ANSWER:**</u>     **Admitted.**

16. The Planning Commission must approve a PASP if the PASP complies with all applicable ordinances and statutes. MCL 125.3501(5).

<u>**ANSWER:**</u>     **Admitted.**

17. Upon approval of a PASP, an applicant may apply for approval of a final area site plan ("FASP") for all or any phase of a proposed PUD shown on the approved PASP.

<u>**ANSWER:**</u>     **Admitted.**

18. During the application process for approval of a FASP, the Planning Commission is required to conduct a more in-depth review on each specific phase or development area proposed to be constructed. Ordinance Art. VIII, § 94-213(6)-(7).

<u>**ANSWER:**</u>     **Admitted.**

**<u>JPV's Properties</u>**

19. JPV owns three parcels of property, approximately 49 acres, located at 740 Greenridge Drive NW, 330 Greenridge Drive NW, and 350 Greenridge Drive NW, in Walker, Michigan (collectively, the "Property"). The Property is depicted below:



**ANSWER:**    **Admitted.**

20.    The Property is the location of the former Greenridge Country Club facility and golf course, which existed on the Property from 1931 until 1988, when the Property was sold to a developer.

**ANSWER:**    **Admitted.**

21.    In 1989, the prior owner of the Property applied for rezoning of the Property (and surrounding parcels) from AA Agricultural to RPUD-2, High Density Residential. The prior owner also sought approval of a PASP for a planned unit development on the Property.

**ANSWER:**    **Admitted.**

22.    The City granted the prior owner's application, rezoned the Property to RPUD-2, and approved the prior owner's PASP to develop *186* residential units on the Property. Indeed, the properties subject to the PUD are now developed with retail and multi-family developments.

**ANSWER:**    **Admitted.**

23.    Following the City Commission's rezoning of the Property to RPUD-2 and approval of the prior owner's PASP, a select group of neighboring property owners sued the prior owner of the Property. The City is not, and never has been, a party to that lawsuit. The parties to that lawsuit eventually agreed upon a consent judgment requiring any future development of the Property to adhere to a 150-foot buffer along the easternmost property line against the single-family residential neighborhood. This consent judgment is still in place today.

**ANSWER:**      Admitted.

**JPV's Project and Submissions to the City**

24.      Over the course of the past three decades, build-out of the Property was permitted in accordance with the originally approved PASP with no issues or concerns expressed by the City.

**ANSWER:**      **The allegations contained in paragraph 24 are denied as untrue. By way of further answer, the Master Plan was adopted by the City in 2020.**

25.      In 2021, JPV began working on a new project to develop townhomes on the Property.

**ANSWER:**      Admitted.

26.      On October 21, 2021, JPV and its consultant, Progressive AE, met with City representatives in a pre-application conference to inform the City of JPV's proposed development plan for the Property and to ensure that JPV addressed the City's lawful and legitimate requests concerning the development.

**ANSWER:**      Admitted.

27.      On April 6, 2022, JPV submitted a request for PASP approval.

**ANSWER:**      Admitted.

28.      JPV's PASP proposed to develop 186 multifamily townhomes on the Property, with an overall density of 3.76 units per acre, to be known as "River Ridge Townhomes." The PASP proposed nineteen 6-unit townhome buildings and eighteen 4-unit townhome buildings. The PASP also included various amenities, including a dog park, private streets, private garage parking, and guest parking, preservation of steep slopes and mature trees, and landscaping.

**ANSWER:**      **It is admitted that the proposed PASP proposed to develop 186 multifamily townhomes on the property. It is denied as untrue that the PASP included preservation of steep slopes and mature trees.**

29.      In connection with its request for PASP approval, JPV provided all information required under Section 94-213(2) of the Ordinance.

**ANSWER:**    **The allegations contained in paragraph 29 are denied as untrue as Plaintiff failed to comply with the requirements of the Ordinance by failing to comply with the Master Plan, as well as other standards related to the preservation of the natural environment.**

30.    WV's request for PASP approval demonstrated that the PASP met all of the "preliminary area site plan requirements" under Section 94-213(2) of the Ordinance.

**ANSWER:**    **The allegations contained in paragraph 30 are denied as untrue.**

31.    The City subsequently provided RV with notes for revisions it wanted made to the PASP.

**ANSWER:**    **Admitted.**

32.    On April 14, 2022, RV met with City representatives again to discuss its request for PASP approval and the City's requested revisions, many of which exceeded the Ordinance's requirements.

**ANSWER:**    **It is admitted that a meeting took place on April 14, 2022. The remaining allegations contained in paragraph 32 are denied as untrue.**

33.    Based upon requests from City officials, on May 4, 2022, JPV submitted an amended PASP.

**ANSWER:**    **It is admitted that Plaintiff submitted an amended PASP on May 4, 2022. The Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 33.**

34.    WV's amended PASP provided all information required under Section 94-213(2) and demonstrated that the PASP met all of the "preliminary area site plan requirements" under Section 94-213(2) of the Ordinance and in several ways exceeded those requirements.

**ANSWER:**    **The allegations contained in paragraph 34 are denied as untrue.**

35.    On May 12, 2022, RV attended a Site Plan Review Committee ("SPRC") meeting, at which time the City provided JPV with feedback for additional recommended revisions to the PASP many of which, again, exceeded the Ordinance's requirements for preliminary site plan approval.

**ANSWER:**    **It is admitted that a meeting took place on May 12, 2022. The remaining allegations contained in paragraph 35 are denied as untrue.**

36.     On May 18, 2022, RV submitted a second amended PASP.

**ANSWER:     Admitted.**

37.     JPV's second amended PASP provided all information required under Section 94213(2) of the Ordinance and demonstrated that the PASP not only met, but exceeded, the "preliminary area site plan requirements" under Section 94-213(2).

**ANSWER:     The allegations contained in paragraph 37 are denied as untrue.**

38.     On May 23, 2022, the City requested that RV incorporate its list of 21 additional changes or requirements in the PASP.

**ANSWER:     It is admitted that City staff requested compliance with all relevant ordinances and made requests to allow Plaintiff to come into compliance.**

39.     The City confirmed that the River Ridge Townhomes project was a "cluster style development," so the density calculation could be a "gross density."

**ANSWER:     It is admitted that City staff initially stated the calculation could be "gross density," and it was eventually confirmed by the Planning Commission.**

40.     On May 30, 2022, the City informed JPV, for the first time, that there were concerns regarding impact to any wildlife on the Property. The City asked whether any endangered or threatened species were found on the Property.

**ANSWER:     It is admitted that an inquiry was made by City staff concerning impact on endangered, threatened, or otherwise threatened and protected wildlife consistent with the applicable ordinances.**

41.     On or around May 31, 2022, the City's professional planning consultant prepared a memorandum analyzing the City's Master Plan's references to the Property. The City's consultant's memorandum concluded that based on the Master Plan, any development on the Property should have the following characteristics: (a) the development should be residential; (b) the residential density should be somewhere between the existing multi-family to the west and the existing single family to the east; (c) specific housing typologies should be "like against like," with multi-family buildings abutting multi-family and single family buildings abutting single family; (d) trees and hillsides should be preserved as much as possible within a specific area designated as open space; and (e) the road layout should advance the goal of creating a connection between North Center Drive to 4 Mile Road.

**ANSWER:** **It is admitted that Chris Khorey of McKenna prepared a memorandum concerning the Property and the need to comport with the Defendant City's Master Plan.**

42. Even though a review and consideration of the Master Plan is not necessary (or relevant), when, as here, the zoning and permitted uses have been established, JPV's PASP included all the characteristics set forth in the City's consultant's memorandum.

**ANSWER:** **The allegations contained in paragraph 42 are denied as untrue.**

**The Planning Commission Tables JPV's Request for PASP Approval**

43. On June 1, 2022, the Planning Commission held a public hearing to review WV's second amended PASP.

**ANSWER:** **Admitted.**

44. During this hearing, the City Planning Director provided a report on JPV's second amended PASP.

**ANSWER:** **Admitted.**

45. The Planning Director's report confirmed that the Property was zoned RPUD-2, and thus the zoning was in place for JPV to move forward with its request for PASP review.

**ANSWER:** **Admitted.**

46. Despite confirming that the Property was already properly zoned, and, as a result, the PASP's compliance with the City's Master Plan was not a relevant consideration, the City Planning Director's report confirmed that the land use was appropriate for the area per the Master Plan.

**ANSWER:** **It is admitted that the Property was properly zoned. The remaining allegations contained in paragraph 46 are denied as untrue.**

47. The Planning Director's report further confirmed that because RPUD-2 does not have a "minimum open space requirement," the amount provided by JPV was acceptable and was also what kept the overall density under 4 units per acre.

**ANSWER:** **Admitted.**

48. That said, the Planning Director's report determined that the 21 items requested by the City at the May 12, 2022 SPRC meeting to be added to or changed on the PASP had supposedly not been addressed.

**ANSWER:**      **It is admitted that some items the Defendant City asked to be addressed by**

**Plaintiff following the May 12, 2022, meeting were not addressed by Plaintiff.**

49.      As a result, the Planning Director recommended that the Planning Commission table any action on JPV's proposed PASP until those items had been addressed.

**ANSWER:**      **Admitted.**

50.      The Planning Commission took the Planning Director's recommendation and tabled JPV's request for approval of the PASP.

**ANSWER:**      **Admitted.**

51.      The Planning Commission determined that JPV must revise, add, or correct the items addressed in the Planning Director's report.

**ANSWER:**      **Admitted.**

52.      The Planning Commission determined that JPV must provide even more information, including: a current topographic survey; an overall stormwater impact analysis; an analysis conducted by the Kent County Drain Commission; a wetland delineation; a traffic impact analysis; a private well analysis; and an endangered species analysis.

**ANSWER:**      **Admitted.**

53.      The Planning Commission required JPV to provide more information on the history of events and development that had significantly impacted the Alpine-Walker Drain.

**ANSWER:**      **Admitted.**

54.      Despite confirming that the City was not a party to the 1989 consent judgment and thus could not enforce a lawsuit that it was not involved in, the Planning Commission required JPV's PASP to recognize the 150-foot buffer prescribed by the 1989 consent judgment and to remove all proposed storm detention basins from that buffer.

**ANSWER:**      **Admitted.**

55.      Nothing in the 1989 consent judgment prohibits stormwater detention basins from being placed in the 150-foot buffer. The 1989 consent judgment merely provides that no buildings or other physical facilities may be located in the buffer.

**ANSWER:**      **The Defendant is without knowledge or information sufficient to form a belief as**

**to the truth of the allegations contained in paragraph 55.**

56. The Planning Commission determined that JPV must hold a neighborhood meeting before being placed on future Planning Commission agenda.

**ANSWER:**    **Admitted.**

57. Finally, the Planning Commission determined that a public work session should be held with JPV about the PASP.

**ANSWER:**    **Admitted.**

58. On June 8, 2022, JPV held a neighborhood outreach meeting.

**ANSWER:**    **Admitted.**

59. On June 20, 2022, JPV hosted the Planning Commissioners on a site visit on the Property, which was followed up by a work session with City staff, the Planning Commissioners, and JPV.

**ANSWER:**    **Admitted.**

60. On December 1, 2022, JPV and Progressive AE met with representatives of the Kent County Drain Commission and confirmed their alignment on the proposed Property layout with respect to stormwater.

**ANSWER:**    **Admitted.**

61. On December 14, 2022, JPV and Progressive AE met with representatives of the Kent County Drain Commission, Alpine Township, and the City to discuss issues including stormwater impact and impacts on drains on the Property.

**ANSWER:**    **It is admitted that such a meeting occurred on December 14, 2022, and it is further admitted there were discussions concerning the Alpine-Walker drain on the northern portion of the property. It is denied as untrue there was any discussion regarding drains and waterways on the southern portion of the property.**

62. On December 15, 2022, JPV and Progressive AE met with City representatives in another pre-application conference to inform the City of JPV's revised PASP before the February 1, 2023 Planning Commission public hearing on JPV's request for PASP approval.

**ANSWER:**    **Admitted.**

63. On January 18, 2023, JPV submitted a third amended PASP.

**ANSWER:**      **Admitted.**

64.      JPV's third amended PASP proposed seventeen 6-unit buildings and twenty-one 4-unit buildings, with an overall density of 3.76 units per acre.

**ANSWER:**      **Admitted.**

65.      JPV's third amended PASP provided all information required under Section 94-213(2) and demonstrated that the PASP met all of the "preliminary area site plan requirements" under Section 94-213(2) of the Ordinance. Indeed, the third amended PASP exceeded the Ordinance requirements in several ways.

**ANSWER:**      **The allegations contained in paragraph 65 are denied as untrue.**

66.      WV's third amended PASP included a Trip Generation Analysis letter prepared by Progressive AE, which showed that the development would generate minimal impact on existing traffic operations along adjacent roadways.

**ANSWER:**      **Admitted.**

67.      JPV's third amended PASP included an Information for Planning and Consultation ("IPaC") preliminary report prepared using data from the U.S. Fish and Wildlife Service. The IPaC showed that there are no critical habitats on the Property.

**ANSWER:**      **Admitted.**

**The Planning Commission Tables JPV's Request for a Second Time**

68.      On February 1, 2023, the Planning Commission held a public hearing on WV's request for approval of the third amended PASP.

**ANSWER:**      **Admitted.**

69.      Despite WV's insistence that the Planning Commission decide on its request for approval of the third amended PASP, the Planning Commission once again tabled JPV's request and demanded that even more conditions be met.

**ANSWER:**      **Admitted.**

70.      To further delay action on the third amended PASP, the Planning Commission requested a formal legal interpretation from the City Attorney about its role in applying the 1989 consent judgment between private entities, required JPV to provide more hydrology and hydraulic information regarding existing and project-related stormwater, flood control, and private water well impacts, and directed JPV to develop water well information with the Kent County Drain Commission.

**ANSWER:**        Any allegation contained in paragraph 70 implying Defendant City purposefully delayed action on Plaintiff's PASP is denied as untrue. It is admitted that a request was made to the City Attorney from the Planning Commission to ensure legal compliance in their review of the PASP.

71.     Although JPV had provided the Trip Generation Analysis letter, showing that the development would generate minimal impact on traffic, the Planning Commission required JPV to provide a full scale and comprehensive traffic study.

**ANSWER:**        The allegations contained in paragraph 71 are denied as untrue.

72.     Although JPV provided the IPaC, reflecting that there are no critical habitats on the Property, the Planning Commission required JPV to provide a new endangered species report, which must be generated through contact with the Michigan Department of Natural Resources.

**ANSWER:**        Admitted.

73.     The Planning Commission also required JPV to provide additional wetland survey information, to be confirmed by EGLE and a new plan sheet showing existing forest cover.

**ANSWER:**        Admitted.

74.     The Planning Commission determined that JPV's request for approval of the third amended PASP would remain tabled until JPV satisfied the City's conditions and submitted requested documentation.

**ANSWER:**        Admitted.

75.     On February 13, 2023, the City passed a Parks and Recreation Master Plan, identifying the Property as a "potential land acquisition" for the City to purchase to grow current parks and trails for neighborhood connections to recreation and natural areas and increase park land.

**ANSWER:**        Admitted.

76.     On August 23, 2023, Progressive AE met with representatives of the City to discuss all of the City's newly imposed requirements. Progressive AE and City representatives aligned on many of the open items.

**ANSWER:**        The Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 76.

77.     For example, JPV had obtained preliminary approval of storm water drainage arrangements from the Kent County Drain Commissioner.

**ANSWER:** **It is admitted that Plaintiff received approval from the Kent County Drain Commissioner related to the Alpine-Walker Drain on the northern portion of the property. It is denied as untrue there were any approvals with respect to drains or waterways on the southern portion of the property.**

78.     The City informed Progressive AE that a letter from MDOT saying the projected traffic impacts were acceptable could negate need for any other traffic study and the IPaC analysis submitted thus far was likely sufficient to respond to the City's request for an endangered species survey.

**ANSWER:** **It is admitted that City informed Progressive AE that a letter from MDOT would be sufficient in lieu of another traffic study. It is denied as untrue that the IPaC analysis was likely to be sufficient to respond to the request for an endangered species survey.**

79.     Progressive AE asked to have the application placed back on the Planning Commission agenda as soon as possible, and was informed that the third amended PASP would be placed back on the agenda for the October meeting of the Planning Commission.

**ANSWER:** **It is admitted that the PASP was planned to be added to one of the two October meetings of the Planning Commission.**

80.     On September 7, 2023, a representative of MDOT concurred with the findings of Progressive AE's Trip Generation Analysis for the River Ridge Townhomes project.

**ANSWER:** **Admitted.**

**The City Adopts an "Emergency" Moratorium, Blocking JPV's Request**

81.     Before the October meeting, and to the surprise of JPV and Progressive AE, the City adopted an "emergency" ordinance to impose a moratorium on the issuance of any zoning approvals, rezonings, permits, variances, licenses, or other similar approvals for designated properties (the "Moratorium"). The timing of the "emergency" ordinance and the fact that JPV was not provided notice until the day of the meeting, when it discovered the action through other sources, demonstrate that the Moratorium was targeted to block JPV's application.

**ANSWER:** **It is admitted the City adopted a temporary moratorium. The remaining allegations contained in paragraph 81 are denied as untrue.**

82.     JPV, through its counsel, submitted a letter to the City in an effort to dissuade City from imposing the Moratorium, to no avail. (Ex. A, September 11, 2023 Letter re: Proposed Ordinance No. 23-672.)

**ANSWER:** **It is admitted counsel for JPV submitted a letter to the City dated September 11, 2023..**

83.     The Moratorium prohibited the approval or issuance of any City permit, zoning compliance permit, license, zoning approval, rezoning, variance or similar or other approval for any residential development of land at a proposed density of 3.5 or more units per acre.

**ANSWER:** **Admitted.**

84.     The Moratorium was aimed at JPV and caused JPV's application to be removed from the October Planning Commission meeting agenda.

**ANSWER:** **The allegations contained in paragraph 84 are denied as untrue.**

85.     The Moratorium included supposed findings that the City was in process of amending large portions of the Ordinance, and that the City was undertaking targeted Master Plan updates to be substantially completed by March 2024, which are to include the consideration of designating certain higher-density developments as recommended for special exception reviews as well as clarifying and interpreting future land use maps and developing associated text for higher-density residential areas.

**ANSWER:** **Admitted.**

86.     Nothing about the Moratorium suggested there was any "emergency"; the City completed a full revision to its Master Plan in or around October 2020. The only "emergency" was that JPV's application was scheduled to be considered at the upcoming Planning Commission meeting.

**ANSWER:** **The allegations contained in paragraph 86 are denied as untrue.**

87.     The Moratorium was to remain in effect for six months.

**ANSWER:** **It is admitted that the original moratorium was intended to remain in effect for six months once it was fully approved.**

88. On October 18, 2023, JPV submitted a fourth amended PASP to remove units and buildings. The modifications to the PASP brought the density below the threshold for the Moratorium.

**ANSWER:** **Admitted.**

89. JPV's fourth amended PASP also included a revised wetland delineation; MDOT's confirmation of the findings set forth in Progressive AE's Trip Generation Analysis letter; confirmed that there would be no major impact on the Alpine-Walker Drain; noted the Kent County Drain Commission's approval of JPV's stormwater management approach; and included a soil asbestos testing report, showing a lack of asbestos.

**ANSWER:** **It is admitted that the PASP included a wetland delineation that did not include the entire year, and that the stormwater management approach only addressed the Alpine-Walker Drain, did not address other drains or waterways on the property, and did not include a well analysis.**

90. On October 26, 2023, Progressive AE again met with City staff. The City did not push back on JPV's reasoning for not providing a full traffic study, and noted that there would be fewer impacts since WV had reduced the number of units. The City confirmed that a private well analysis need not be conducted because soil testing had confirmed that no asbestos was found in the soil.

**ANSWER:** **The allegations contained in paragraph 90 concerning well analysis are denied as untrue. The remaining allegations contained in paragraph 90 are admitted.**

91. JPV submitted a fifth amended PASP on November 20, 2023.

**ANSWER:** **Admitted.**

92. Taking no chances, RV hosted another meeting with neighbors to discuss changes to the PASP and the dramatic decrease in units and density.

**ANSWER:** **Admitted.**

93. Following several meetings with City staff, WV's request for PASP approval was placed back on the Planning Commission meeting agenda and was scheduled to be considered at the December 6, 2023 Planning Commission meeting.

**ANSWER:** **Admitted.**

94. On December 4, 2023, after receiving and incorporating input from local residents and City staff, JPV submitted a sixth amended PASP.

**ANSWER:**      **Admitted.**

95.      JPV's sixth amended PASP proposed 162 units in 27 4-unit buildings and nine 6-unit buildings, with an overall density of 3.42 units per acre.

**ANSWER:**      **Admitted.**

96.      JPV's sixth amended PASP included: a current topographic survey; stormwater impact analysis conducted to the satisfaction of the Kent County Drain Commissioner and the City Engineer; an understanding of the impacts to the Alpine-Walker Drain; and a wetland delineation report and a wetland boundary verification letter.

**ANSWER:**      **It is admitted that the documents referred to in paragraph 96 were submitted with the PASP. In further answer the stormwater impact analysis that was provided addressed only the Alpine-Walker Drain on the northern portion of the property and did not address any other drains or waterways on the property.**

97.      JPV's sixth amended PASP also referenced MDOT's email concurring with Progressive AE's Trip Generation Analysis; that private well analysis was not conducted because the spoil pile on site was tested and it was confirmed that no asbestos was found; and that the IPaC study through the U.S. Fish and Wildlife Service was provided to City staff, who determined that it was sufficient.

**ANSWER:**      **It is admitted that the documents referred to in paragraph 97 were submitted with the PASP. It is denied as untrue City staff determined that no private well analysis was needed.**

98.      JPV's sixth amended PASP provided all information required under Section 94-213(2) and demonstrated that the PASP exceeded all of the "preliminary area site plan requirements" under Section 94-213(2) of the ordinance.

**ANSWER:**      **The allegations contained in paragraph 98 are denied as untrue.**

**The Planning Commission Tables JPV's Request for a Third Time**

99.      On December 6, 2023, the Planning Commission held a third public hearing on JPV's request for PASP approval.

**ANSWER:**      **It is admitted that the Planning Commission reopened its previous public hearing on Plaintiff's request for PASP approval on December 6, 2023.**

100.    To the surprise of JPV, the first part of the Planning Commission meeting involved a debate over whether the density was properly calculated, whether the project constitutes a "cluster development," and whether the project should be included in the Moratorium.

**ANSWER:**        **It is admitted that the Planning Commission discussed whether the density was property calculated and the applicability of the moratorium. The Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 100.**

101.    This was a surprise because the City had previously designated the project as a cluster development and had established the density calculation for the project in May 2022.

**ANSWER:**        **It is admitted that the previous Planning Director had indicated she personally viewed the project as a cluster development. The Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 101.**

102.    Moreover, the Planning Commission's meeting agenda did not reference the consideration of these questions. As a result, JPV had no notice these questions would be discussed and was unable to prepare for the discussion.

**ANSWER:**        **The allegations contained in paragraph 102 are denied as untrue.**

103.    Ultimately, after passionate discussion, a majority of the Planning Commission voted that the project was a cluster development, that the density calculation was correct, that the project was not subject to the Moratorium, and that consideration of JPV's application could proceed.

**ANSWER:**        **Admitted.**

104.    Yet for the third time, the Planning Commission tabled JPV's request for PASP approval despite JPV's repeated requests for a decision.

**ANSWER:**        **It is admitted that Plaintiff's request was tabled as it did not conform with all requirements laid out in the ordinances and Master Plan.**

105.    This time, the Planning Commission tabled the request pending completion of a supposed analysis of the proposed PASP's compliance with the City's Master Plan, to be performed jointly by the Master Plan Consultant, Community Development Department, and the City Attorney. This was in spite of the fact that .TPV had established how the PASP had always complied with the

Master Plan and had been repeatedly changed in response to comments to even better comply with the Master Plan, even though JPV asserted that the PASP's compliance was not even a relevant determination.

**ANSWER:**      **The allegations contained in paragraph 105 are denied as untrue.**

106.    Taking no chances, on January 2, 2024, RV submitted additional analysis that specifically addressed the PASP's compliance with the City's Master Plan and how the PASP greatly exceeded the standards that had been previously provided to RV by the City's planning consultant, despite the fact that JPV's PASP's compliance with the Master Plan was irrelevant at this stage.

**ANSWER:**      **It is admitted that additional analysis was submitted, but it is denied as untrue**

**that Plaintiff was in compliance with the City's Master Plan or that the Master Plan was**

**irrelevant.**

107.    On January 7, 2024, RV submitted a seventh amended PASP, which addressed feedback from the Planning Commission and included detailed site grading and utility plans, shifting of storm water retention areas, shifting of cul de sacs, and repositioning of buildings to avoid facing the residential community.

**ANSWER:**      **Admitted.**

108.    WV's seventh amended PASP ultimately included, among other things:

a.      A current topographic survey;

b.      A stormwater impact analysis, approved by the Kent County Drain Commission;

c.      A winter wetland delineation report, a new grow season wetland delineation report, and a wetland boundary verification letter;

d.      Progressive AE's Trip Generation Analysis letter, showing that the development would generate minimal impact on traffic;

e.      The IPaC, reflecting that there are no critical habitats on the Property;

f.      An asbestos testing report, showing no asbestos in the soil on the Property; and

g.      A plan sheet showing existing tree cover on the Property.

**ANSWER:**     **Admitted, and by way of further answer the stormwater impact analysis only addressed the Alpine-Walker Drain on the northern portion of the property and did not address any other drains or waterways on the Property.**

109.    JPV's seventh amended PASP provided all information required under Section 94-213(2) and demonstrated that the PASP exceeded all of the "preliminary area site plan requirements" under Section 94-213(2).

**ANSWER:**     **The allegations contained in paragraph 109 are denied as untrue.**

110.    The City's Planning Department determined that JPV's seventh amended PASP satisfied the requirements for PASP approval under the Ordinance.

**ANSWER:**     **It is admitted that the Planning Department determined that Plaintiff's PASP satisfied the requirements for conditional approval.**

111.    The City Engineer Department determined that JPV's seventh amended PASP satisfied the requirements for PASP approval under the Ordinance.

**ANSWER:**     **It is admitted that the City Engineer Department determined that Plaintiff's PASP satisfied the requirements for conditional approval.**

112.    The Kent County Drain Commissioner and MDOT determined that JPV's seventh amended PASP satisfied the requirements for PASP approval under the Ordinance.

**ANSWER:**     **The allegations contained in paragraph 112 are denied as untrue. By way of further answer, neither the Kent County Drain Commissioner nor MDOT has jurisdiction to determine compliance with Defendant City's ordinances and Master Plan.**

**The Planning Commission Denies JPV's Request**

113.    On January 17, 2024, the Planning Commission held another meeting and considered WV's PASP.

**ANSWER:**     **Admitted.**

114.    During the meeting, Frank Wash, the City's assistant manager, raised new supposed concerns about JPV's stormwater analysis for the very first time and claimed that he now somehow couldn't "defend the engineering on your project" despite City staff previously approving those plans.

**ANSWER:**      **The allegations contained in paragraph 114 are denied as untrue.**

115.      The Planning Commission found that JPV's seventh amended PASP "does conform to the intent and to all regulations and standards of the Zoning Ordinance, as applicable."

**ANSWER:**      **The allegations contained in paragraph 115 are denied as untrue.**

116.      But the motion to grant tentative approval of JPV's seventh amended PASP failed in a tie vote with four members in favor and four members against. As a result, the Planning Commission made and passed a motion to table the PASP once more, to the Planning Commission's next meeting when all nine members of the Planning Commission would be present.

**ANSWER:**      **Admitted.**

117.      After JPV's representatives left the January 17, 2024 meeting, Mr. Wash also warned members of the Planning Commission that he was "uncomfortable with a tentative approval" of the PASP, claimed he did not know how the Planning Commission would get out of the development if the PASP was approved with conditions, and stated that a tentative denial of the PASP was "pretty easy."

**ANSWER:**      **The allegations contained in paragraph 117 are denied as untrue.**

118.      On February 7, 2024, the Planning Commission held another meeting to consider JPV's PASP.

**ANSWER:**      **Admitted.**

119.      The Planning Commission determined that JPV's seventh amended PASP did not comply with the City's Master Plan, even though JPV's PASP's compliance with the Master Plan was not a necessary or relevant consideration given that the Property had previously been rezoned.

**ANSWER:**      **It is admitted the Planning Commission determined the PASP did not comply with the Master Plan. The remaining allegations contained in paragraph 119 are denied as untrue.**

120.      The Planning Commission determined that JPV's seventh amended PASP did not comply with the City's Master Plan, even though it was agreed that the objective provisions of the Master Plan, with respect to density and use, were satisfied.

**ANSWER:**      **Admitted.**

121.     The Planning Commission denied JPV's request for approval of the seventh amended PASP in a five to four vote, despite the fact that JPV's PASP met and exceeded the Ordinance's requirements for preliminary site plan approval.

**ANSWER:**        **It is admitted that the Planning Commission denied Plaintiff's request for approval in a five to four vote. It is denied as untrue that Plaintiff met and exceed the ordinance's requirements for preliminary site plan approval.**

**The City's Decision Contradicts Its Own Precedent**

122.     The City has approved PASPs for larger, more impactful projects, which had significantly higher density.

**ANSWER:**        **Admitted.**

123.     For example, in or around March 2021, the City approved a PASP for a 552-unit multi-family development on the property formerly known as the English Hills Golf Course.

**ANSWER:**        **Admitted.**

124.     The English Hills Golf Course site is approximately 140 acres.

**ANSWER:**        **Admitted.**

125.     The overall density of the English Hills Golf Course redevelopment project was approximately 3.87 units per acre.

**ANSWER:**        **Admitted.**

126.     The English Hills Golf Course redevelopment project required the submission of a rezoning request for one of the involved properties, from AA to RPUD-2, which the City Commission approved.

**ANSWER:**        **It is admitted that the English Hills Golf Course redevelopment project's rezoning request was approved in 2002.**

127.     The City did not require the applicant to provide an endangered species analysis, a well study, or a tree survey in connection with the English Hills Golf Course redevelopment project.

**ANSWER:**        **The allegations contained in paragraph 127 are denied as untrue, as a tree survey was required.**

128.     For another example, in or around September 2021, the City approved a PASP for a 318-unit commercial, single family residential and multi-family residential planned unit development, called "Waterford Village."

**ANSWER:**        **Admitted.**

129.     The Waterford Village project site is approximately 105 acres, and was formerly used as a golf course.

**ANSWER:**        **Admitted.**

130.     The overall density of the proposed RPUD-2, multifamily residential portion of the Waterford Village project was approximately 6.74 units per acre.

**ANSWER:**        **Admitted.**

131.     The Waterford Village project required the submission of a rezoning request for the involved properties, from AA to RPUD-1, RPUD-2, and CPUD, which the City Commission approved.

**ANSWER:**        **Admitted.**

132.     The City did not require the applicant to provide an endangered species analysis, a well study, or a tree survey in connection with the Waterford Village project.

**ANSWER:**        **Admitted.**

133.     Following the approval of the PASP for Waterford Village, the Planning Commission required the applicant to provide a comprehensive drainage study to confirm "zero impact" from the proposed development on adjacent properties.

**ANSWER:**        **Admitted.**

134.     The project sites for the English Hills Golf Course redevelopment and the Waterford Village are former golf courses, like the Property, yet the City approved the PASPs for these projects and denied JPV's request for PASP approval.

**ANSWER:**        **The allegations contained in paragraph 134 are denied as untrue as the projects are not similarly situated.**

135.     The English Hills Golf Course redevelopment project and the Waterford Village project cover more than double the acreage of the River Ridge Townhomes project, yet the City approved the PASPs for these projects and denied JPV's request for PASP approval.

**ANSWER:**      **The allegations contained in paragraph 135 are denied as untrue as the projects are not similarly situated.**

136.    The English Hills Golf Course redevelopment project and the Waterford Village project provided for development of significantly more units than the River Ridge Townhomes project, yet the City approved the PASPs for these projects and denied JPV's request for PASP approval.

**ANSWER:**      **The allegations contained in paragraph 136 are denied as untrue as the projects are not similarly situated.**

137.    The overall density of the multifamily residential portions of the English Hills Golf Course redevelopment project and the Waterford Village project was significantly higher—more than double—than that of the River Ridge Townhomes project, yet the City approved the PASPs for these projects and denied JPV's request for PASP approval.

**ANSWER:**      **It is admitted that projects that were not similarly situated to Plaintiff's were approved and Plaintiff's project has not yet been approved.**

138.    The English Hills Golf Course redevelopment project and the Waterford Village project required rezoning of the properties, whereas the River Ridge Townhomes project did not, yet the City approved the PASPs for these projects and denied JPV's request for PASP approval.

**ANSWER:**      **It is admitted that projects that were not similarly situated to Plaintiff's were approved and Plaintiff's project has not yet been approved.**

139.    The City did not require the applicants in the English Hills Golf Course redevelopment project or the Waterford Village project to provide an endangered species analysis, a well study, or a tree survey, yet the City required WV to present this information.

**ANSWER:**      **It is denied as untrue that a tree survey was not required on these differently situated projects, but it is admitted that these differently situated projects had different requirements than Plaintiff's project.**

140.    The City did not require the applicant in the Waterford Village project to provide a comprehensive drainage study prior to approving the PASP, yet the City required WV to provide a comprehensive drainage study before it would approve or deny JPV's PASP.

**ANSWER:**     **It is admitted that projects that were not similarly situated to Plaintiff's were approved and that theirs was not.**

**The City's Denial of Approval**

141.     Under Michigan law, the City is required to approve a PASP submitted in compliance with its zoning ordinance and other applicable law.

**ANSWER:**     **The allegations contained in paragraph 141 are denied as untrue.**

142.     The City improperly required WV's PASP to comply with its Master Plan, which is required on a petition for rezoning—not a request for approval of a PASP.

**ANSWER:**     **The allegations contained in paragraph 142 are denied as untrue.**

143.     Even if conformance with the City's Master Plan was a relevant consideration on JPV's request for approval, JPV demonstrated the PASP's conformance with the Master Plan.

**ANSWER:**     **The allegations contained in paragraph 143 are denied as untrue.**

144.     The City improperly required JPV to present evidence regarding certain characteristics of the proposed development as set forth under Section 94-213(3)(e), which are required on a petition for rezoning—not a request for approval of a PASP.

**ANSWER:**     **The allegations contained in paragraph 144 are denied as untrue.**

145.     Specifically, the City improperly required JPV to present stormwater drainage reports and studies and wetlands delineation reports.

**ANSWER:**     **The allegations contained in paragraph 145 are denied as untrue.**

146.     Even if the characteristics set forth under Section 94-213(3)(e) did apply to JPV's PASP, RV presented evidence to satisfy those characteristics.

**ANSWER:**     **The allegations contained in paragraph 146 are denied as untrue.**

147.     The City also improperly required RV to present reports or information on additional characteristics not found anywhere in Section 94-213, including: a full scale and comprehensive traffic study, an endangered species report, and a private well analysis.

**ANSWER:**     **The allegations contained in paragraph 147 are denied as untrue.**

148.     Moreover, when JPV did provide information requested by the City—often at JPV's significant time and expense—the City repeatedly moved the goal posts by requiring new information and reports.

**ANSWER:**     The allegations contained in paragraph 148 are denied as untrue.

149.    The City's February 2023 identification of the Property as a "potential land acquisition" to increase park land makes clear that the City never intended to approve JPV's PASP and would block any proposed development of the Property.

**ANSWER:**     The allegations contained in paragraph 149 are denied as untrue.

150.    Because JPV's PASP complies with all specific requirements of the PUD Regulations in the Ordinance, JPV is entitled to approval of the PASP as a matter of law.

**ANSWER:**     The allegations contained in paragraph 150 are denied as untrue.

151.    The City's failure to act on the PASP, as set forth above, violates WV's right to substantive due process and equal protection, under state and federal law.

**ANSWER:**     The allegations contained in paragraph 151 are denied as untrue.

152.    In addition to violating the Ordinance, the City's failure to approve the PASP is unlawful under the MZEA for at least the following reasons:

a.    Under the MZEA, a decision rejecting, approving, or conditionally approving a site plan shall be based on the requirements and standards contained in a zoning ordinance, other statutorily authorized and properly adopted local unit of government planning documents, other applicable ordinances, and state and federal statutes, and the City's actions in this case violate that mandate, MCL 125.3501(4);

b.    Under the MZEA, a site plan must be approved if it contains the information required by the zoning ordinance and is in compliance with the conditions imposed under the zoning ordinance, other statutorily authorized and properly adopted local unit of government planning documents, other applicable ordinances, and state and federal statutes, MCL 125.3501(5).

**ANSWER:**     The allegations contained in paragraph 152 are denied as untrue.

153.    JPV has been irreparably harmed and has no adequate remedy at law as a result of the City's breach of its duties because JPV is unable to lawfully use and develop its properties as anticipated by state law and the Ordinance, in addition to suffering ongoing economic harm as a result of the City's breach.

**ANSWER:**     The allegations contained in paragraph 153 are denied as untrue.

## COUNT I — DECLARATORY JUDGMENT

154.     JPV repeats and realleges the foregoing paragraphs as if fully set forth herein.

**ANSWER:**     **Defendant incorporates paragraph 1 through 153 of its Answer.**

155.     "In a case of actual controversy within its jurisdiction, a Michigan court of record may declare the rights and other legal relations of an interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted." MCR 2.605(A)(1).

**ANSWER:**     **The court rule quoted in paragraph 155 calls for no response and speaks for itself.**

156.     There is an actual controversy here because JPV contends that the City has deprived it of the rights protected by the Michigan and United States Constitutions under the color of law.

**ANSWER:**     **The allegations contained in paragraph 156 are denied as untrue.**

157.     The City has refused to approve JPV's seventh amended PASP.

**ANSWER:**     **It is admitted the PASP has not yet been approved.**

158.     JPV's seventh amended PASP meets all City of Walker Ordinances in effect at the time of its submission and included all the information required under Section 94-213.

**ANSWER:**     **The allegations contained in paragraph 158 are denied as untrue.**

159.     Approval of JPV's seventh amended PASP is not discretionary if the request meets the standards cited in the Ordinance.

**ANSWER:**     **It is admitted that approval would be granted if Plaintiff met with the standards cited in the ordinance, but the implication that Plaintiffs have done so is denied as untrue.**

**COUNT II - SUPERINTENDING CONTROL**

160.     JPV repeats and realleges the foregoing paragraphs as if fully set forth herein.

**ANSWER:**     **Defendant incorporates paragraph 1 through 159 of its Answer.**

161.     For the reasons set forth above, the City has deprived WV of the rights protected by the Michigan and United States Constitutions under the color of law.

**ANSWER:**     **The allegations contained in paragraph 161 are denied as untrue.**

162.     The City has refused to approve JPV's seventh amended PASP.

**ANSWER:**       **It is admitted the PASP has not yet been approved.**

163.    WV's seventh amended PASP meets all City of Walker Ordinances in effect at the time of its submission and included all the information required under Section 94-213.

**ANSWER:**       **The allegations contained in paragraph 163 are denied as untrue.**

164.    Approval of JPV's seventh amended PASP is not discretionary if the request meets the standards cited in the Ordinance.

**ANSWER:**       **It is admitted that approval would be granted if Plaintiff met with the standards cited in the ordinance, but the implication that Plaintiffs have done so is denied as untrue.**

165.    The City Planning Commission is subject to superintending control by this Court.

**ANSWER:**       **It is admitted that this Court has the authority to exercise superintending control, but it is denied as untrue Plaintiff has met its burden of demonstrating entitlement to such relief.**

166.    WV does not have another specific legal remedy without the aid of an order of superintending control.

**ANSWER:**       **The allegations contained in paragraph 166 are denied as untrue.**

**COUNT III - SUBSTANTIVE DUE PROCESS VIOLATION**

167.    JPV repeats and realleges the foregoing paragraphs as if fully set forth herein.

**ANSWER:**       **Defendant incorporates paragraph 1 through 166 of its Answer.**

168.    The United States Constitution and the Michigan Constitution provide that no person shall be deprived of life, liberty, or property, without due process of law. US Const amend V, XIV; Mich Const Art 1, § 17.

**ANSWER:**       **The legal citations provided in paragraph 168 do not call for a response and speak for themselves.**

169.    RV has a protected interest in the use that is permitted by the RPUD-2 zoning classification.

**ANSWER:**       **The allegations contained in paragraph 169 are denied as untrue.**

170.    There is no rational basis for the City's refusal to approve RV's seventh amended PASP.

**ANSWER:**        **The allegations contained in paragraph 170 are denied as untrue.**

171.    The City's refusal to approve JPV's seventh amended PASP was arbitrary and capricious and deprived JPV of its right to substantive due process under the United States and Michigan Constitutions.

**ANSWER:**        **The allegations contained in paragraph 171 are denied as untrue.**

172.    The City's failure to comply with its own Ordinance, and otherwise comply with law, was arbitrary and capricious and deprived JPV of its right to substantive due process under the United States and Michigan Constitutions.

**ANSWER:**        **The allegations contained in paragraph 172 are denied as untrue.**

173.    In depriving JPV of its right to substantive due process, the City acted maliciously and willfully, with callous indifference to JPV's protected right.

**ANSWER:**        **The allegations contained in paragraph 172 are denied as untrue.**

174. The City's actions have caused JPV to suffer irreparable harm, effectively depriving JPV of the right to engage in the development of its property and threatening the economic prospects of JPV.

**ANSWER:**        **The allegations contained in paragraph 174 are denied as untrue.**

175.    WV is entitled to relief pursuant to 42 U.S.C. § 1983.

**ANSWER:**        **The allegations contained in paragraph 175 are denied as untrue.**

**COUNT IV – TAKINGS**

176.    JPV repeats and realleges the foregoing paragraphs as if fully set forth herein.

**ANSWER:**        **Defendant incorporates paragraph 1 through 175 of its Answer.**

177.    Article X, § 2 of the Michigan Constitution restricts the government from taking property for a public use without the payment of just compensation.

**ANSWER:**        **The legal citations provided in paragraph 177 do not call for a response and speak for themselves.**

178.    Under the Fifth Amendment to the United States Constitution, as it applies to the states through the Fourteenth Amendment, the government also may not take property for a public use without the payment of just compensation.

**ANSWER:**    **The allegations contained in paragraph 178 are not properly pled factual allegations but instead are legal contentions. The Defendant is without knowledge or information sufficient to form a belief as to the truth of the legal contentions contained in paragraph 178.**

179.    A zoning ordinance as applied or on its face or other municipal actions may effect a taking of property through inverse condemnation.

**ANSWER:**    **The allegations contained in paragraph 179 are not properly pled factual allegations but instead are legal contentions. The Defendant is without knowledge or information sufficient to form a belief as to the truth of the legal contentions contained in paragraph 179.**

180.    The City has systematically and intentionally taken measures against JPV to prevent the development of its Property in accordance with its rights, to the detriment of WV and the general public interest in compliance with existing ordinances.

**ANSWER:**    **The allegations contained in paragraph 180 are denied as untrue.**

181.    The City's actions, as detailed above, have gone beyond mere regulation and have effectuated a taking of JPV's protected property interests.

**ANSWER:**    **The allegations contained in paragraph 181 are denied as untrue.**

182.    JPV has reasonable investment-backed interests with which the City has substantially interfered.

**ANSWER:**    **The allegations contained in paragraph 182 are denied as untrue.**

183.    The City's calculated and intentional attempts to delay and block JPV's development of the Property have been extraordinary and exceed any normally expected delays in the site plan approval process.

**ANSWER:**    **The allegations contained in paragraph 183 are denied as untrue.**

184.    The actions taken by the City have had significant economic impact on JPV, which impact continues and grows.

**ANSWER:**        **The allegations contained in paragraph 184 are denied as untrue.**

185.    It is clear from the history of the City's actions that no amount of reports or information would have been sufficient for the City to approve the PASP. Indeed, it is clear from the City's actions that there is no townhomes project that could have been developed on the Property with the permitted density that would have been approved by the City. As such, the City's actions result in a total loss of the value of the project.

**ANSWER:**        **The allegations contained in paragraph 185 are denied as untrue.**

186.    The actions taken, as set forth above, are contrary to law.

**ANSWER:**        **It is denied as untrue the City has taken the actions attributed to it by Plaintiff. It is denied as untrue the City has acted contrary to law.**

187.    SPY is entitled to relief pursuant to 42 U.S.C. § 1983.

**ANSWER:**        **The allegations contained in paragraph 187 are denied as untrue.**

188.    Accordingly, JPV is entitled to compensation for the temporary or permanent taking of its properties.

**ANSWER:**        **The allegations contained in paragraph 188 are denied as untrue.**

### COUNT V — EQUAL PROTECTION VIOLATION

189.    JPV repeats and realleges the foregoing paragraphs as if fully set forth herein.

**ANSWER:**        **Defendant incorporates paragraph 1 through 188 of its Answer.**

190.    The Fourteenth Amendment of the United Stated Constitution and Article I, Section 2 of the Michigan Constitution guarantee citizens equal protection of the laws.

**ANSWER:**        **The legal citations provided in paragraph 190 do not call for a response and speak for themselves.**

191.    The City's refusal to approve JPV's seventh amended PASP was arbitrary and invidious and violates JPV's rights to equal protection under the Fourteenth Amendment to the United States Constitution and Article I, Section 2 of the Michigan Constitution.

**ANSWER:**        **The allegations contained in paragraph 191 are denied as untrue.**

192.    JPV were treated differently by the City from other similarly situated applicants seeking PASP approval.

**ANSWER:**        **The allegations contained in paragraph 192 are denied as untrue.**

193.    The City has approved other, far larger and more impactful, PASPs without requiring those applicants to submit drainage studies, endangered species analyses, well studies, or tree surveys.

**ANSWER:**        **The allegations contained in paragraph 193 are denied as untrue.**

194.    The City intentionally and arbitrarily discriminated against JPV, denying approval of JPV's seventh amended PASP despite its satisfaction of the City's criteria for approval. This discrimination, based on unconstitutional preferential treatment of similarly situated individuals, lacks a rational basis, fails to reasonably advance a legitimate governmental interest, and is motivated by an illegitimate animus or ill will towards JPV.

**ANSWER:**        **The allegations contained in paragraph 194 are denied as untrue.**

195.    JPV is entitled to relief pursuant to 42 U.S.C. § 1983.

**ANSWER:**        **The allegations contained in paragraph 195 are denied as untrue.**

Respectfully submitted,

DATED:  April 19, 2024                    PLUNKETT COONEY


                                          BY:   _/s/ Michael S. Bogren_____
                                                Michael S. Bogren (P34835)
                                                Charles L. Bogren (P82824)
                                                Attorney for Defendant

## AFFIRMATIVE DEFENSES

NOW COME defendant, City of Walker, raise the following Affirmative Defenses to the

Plaintiff's Complaint.

1.    Plaintiff has failed to state a claim upon which relief can be granted.

2.    Plaintiff lacks a protected property interest in its development proposal.

3.    Plaintiff has not been denied all economically viable use of its property;

therefore its takings claim fails as a matter of law.

4.      Plaintiff's takings claim fails as it has not obtained a final determination as to the use of its property.

5.      Plaintiff's state law claims may be barred by the Governmental Tort Liability Act, M.C.L. 691.1401, *et seq.*

6.      Plaintiff has failed to identify a similarly situated comparator for purposes of an equal protection claim.

7.      Plaintiff cannot demonstrate a way in which it was treated less favorably than a similarly situated entity.

8.      Plaintiff's claim for equitable relief may be barred by the doctrine of unclean hands.

9.      Plaintiff's claim for superintending control fails as the City has not failed to perform a clear legal duty.

10.      Plaintiff may have failed to mitigate its damages.


                                        Respectfully submitted,

DATED:  April 19, 2024              PLUNKETT COONEY


                                        BY:   */s/ Michael S. Bogren*
                                                Michael S. Bogren (P34835)
                                                Charles L. Bogren (P82824)
                                                Attorney for Defendant

**<u>JURY DEMAND</u>**

NOW COME defendant, City of Walker, and demands a trial by jury.

Respectfully submitted,

DATED:  April 19, 2024                PLUNKETT COONEY


BY:___*/s/ Michael S. Bogren*_____
                        Michael S. Bogren (P34835)
                        Charles L. Bogren (P82824)
                        Attorneys for Defendant

Open.00560.41089.33372791-1